995 A.2d 1030

**Jeffrey Maurice THOMPSON**

v.

**STATE of Maryland.**

**No. 2151, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

May 27, 2010.

654

Michael R. Braudes (Elizabeth L. Julian, Acting Public Defender, on the brief), Baltimore, MD, for appellant.

Gray E. O'Connor (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: MEREDITH, WRIGHT, and JAMES A. KENNEY, III, (Retired, Specially Assigned) JJ.

WRIGHT, J.

Appellant, Jeffrey Maurice Thompson, was indicted in the Circuit Court for Baltimore County, Maryland, and charged

with the illegal possession of a regulated firearm, possession of oxycodone, possession of hydrocodone, and related offenses. Following the denial of appellant's motion to suppress evidence, the parties agreed to proceed by way of a not guilty plea on an agreed statement of facts. The court found appellant guilty of illegal possession of a regulated firearm and the State entered a nolle prosequi on the remaining charges. Appellant was then sentenced to five years without the possibility of parole. Appellant timely appealed and presents the following questions for our review:

1. Did the trial court err in denying Appellant's motion to suppress?

2. Should this case be remanded for further proceedings in light of *Arizona v. Gant,* —— U.S. ——, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009)?

For the following reasons, we answer these questions in the negative and therefore shall affirm.

## FACTS AND PROCEDURAL HISTORY

Officer Brown, of the Baltimore County Police Department, testified that he had been a patrol officer for approximately four years, working for the last three years out of Wilkens Precinct.[1] On March 26, 2008, at around 2:50 a.m., Officer Brown noticed a green Lexus vehicle in the area of Route 40 and Old Frederick Road in Baltimore County. After running a check on the vehicle's license tag which was from Maryland, Officer Brown could not find a registration for the vehicle with the Maryland Motor Vehicle Administration ("M.V.A."). Based on that information, Officer Brown stopped the vehicle in the area of Harlem Lane and Region Puff Road. Appellant was driving the vehicle.[2]

---

1. Officer Brown's first name is not specified in the record.

2. There was also a passenger inside the vehicle, and that person was permitted to leave the scene and is not the subject of this appeal.

Officer Brown asked appellant for his license and registration. Although appellant provided his name, he was nervous while responding to Officer Brown's questions and was unable to provide a driver's license or other state identification. Officer Brown advised appellant that his vehicle was stopped because it did not have a registration with the M.V.A., and appellant replied that he believed the vehicle was properly registered.

Appellant eventually produced some insurance documents purporting to be proof of insurance, but those documents included different vehicle identification numbers ("VINs"). Officer Brown testified as follows:

[PROSECUTOR]: When he, when he provided you with that information and with the other information that you were gathering at the time is it [sic], did it come into your knowledge that there was a problem with the car?

[OFF. BROWN]: Yes ma'am.

[PROSECUTOR]: And what was that?

[OFF. BROWN]: Off of the various documents that he supplied one was a Maryland temporary registration. Actually he had two different temporary registrations that he provided. Those documents had different V.I.N. numbers associated with the vehicle. And that's not, usually that's not typical of any type of vehicle. Its one V.I.N. number that's identified as that vehicle along with the documents associated with the vehicle.

[PROSECUTOR]: In your experience as a police officer when you have a car that you're getting two different V.I.N. numbers—

[OFF. BROWN]: Yes ma'am.

[PROSECUTOR]:—what is that indicative of to you?

[OFF. BROWN]: Fraud. And actually it was three different V.I.N. numbers associated. But yes. Its [sic] indicative of fraud. Someone attempting to basically not

---

Additionally, the record on appeal indicates that the vehicle's license tag was from the State of Maryland.

apply or not you know, abide by the rules and regulations of the Transportation Article of Maryland.

[PROSECUTOR]: And did you ever, were you ever able to confirm the defendants identify [sic] prior to arresting him?

[OFF. BROWN]: No ma'am.

[PROSECUTOR]: Okay. What if, what steps did you take to try and do that?

[OFF. BROWN]: Through dispatch what we do is we run M.V.A. checks again. Try to, we run N.C.I.C. checks. That's the National Criminal Information Database. We take various steps. And I've, I did take various steps that night to determine who the defendant was, who the motorist was. And I was not satisfied to, who he was.

[PROSECUTOR]: So, what did you do as a result?

[OFF. BROWN]: Effected arrest.

Officer Brown then searched the vehicle and recovered a digital pocket scale from the glove compartment; U.S. currency, both in a compartment on the driver's side and in a pair of black jeans in the backseat; and, prescription pills inside the center console. At this point, Officer Brown determined that the vehicle "needed to be stored. [The driver] was under arrest. The passenger was not at the scene any longer. In addition to [sic] we still had the problem on the VIN's. There was [sic] three different VIN's to, and the documentation was not satisfactory." Officer Brown testified that the vehicle would be sent to a towing company located off Old Frederick Road. Officer Brown then testified concerning the policy of the Baltimore County Police Department in such instances:

The vehicles that are stored will come into our control. Basically you have to conduct an inventory search to protect motorists from different, basically if they have any items of importance or value in case you need to document that in case something would happen at the storage yard. And basically just to know exactly, also safety reasons what exactly is in the vehicle. What, what are you relinquishing.

Officer Brown continued that he was familiar with the Baltimore County Police Department's policy and standard operating procedures on inventory searches, and a portion of the Department's Field Manual was admitted into evidence at the suppression hearing. That field manual included a section covering vehicle property inventory searches. Although the record is not entirely clear where Officer Brown conducted his inventory search, Officer Brown testified that he searched all containers inside the vehicle and recovered appellant's license in the front zipper compartment of a book bag located in the vehicle's trunk. Officer Brown also found "a loaded black high point nine millimeter pistol containing four nine millimeter rounds" inside the same book bag. Officer Brown testified that this gun was a regulated firearm.

On cross-examination, Officer Brown clarified that appellant gave him two registrations and a proof of insurance and that these documents contained various VINs. The actual VIN on the car itself was JT8BF28G8W5022214. Officer Brown then testified that appellant gave him a document, identified as Defendant's Exhibit Number 1, that included appellant's name and a VIN for the Lexus ending in the numbers 4405. Appellant also provided Officer Brown with a document identified as a "registration certificate" with the VIN listed as JT8BF28G2W5047223.

In addition, Officer Brown did not recall whether he checked appellant's driver's license information on his computer, but he did testify that he checked it with dispatch. Officer Brown gave dispatch appellant's name and date of birth but did not recall what dispatch advised concerning that information. Officer Brown testified that, if they advised that appellant did not have a license, he would have possibly remembered.[3]

On further cross-examination, Officer Brown testified that appellant was arrested for "failure to provide sufficient identi-

---

**3.** Later, during argument on the motion, Officer Brown indicated that during the inventory search appellant's license was located on top of the gun in the same compartment of the book bag.

fication." Officer Brown could not recall whether appellant gave him an expired college identification. Officer Brown testified that such a college identification was not a Maryland State identification, or any other state identification, and that it was not sufficient proof of appellant's identity.[4] He also testified that a birth certificate would not be sufficient proof, and he could not recall if appellant actually offered to provide a birth certificate at the time of the stop.

Appellant then testified on his own behalf at the suppression hearing. Appellant confirmed that Officer Brown advised him that he was stopped because his license tags did not appear in the M.V.A. system. Appellant agreed that he did not provide license and registration when asked. However, appellant claimed he gave Officer Brown an expired identification card from Howard Community College. He also provided his name and believed he may have provided his date of birth. Appellant also testified that he tried to give Officer Brown his birth certificate and social security card, but Officer Brown told him "that he didn't want a look at it or take it." Appellant also confirmed that he gave Officer Brown various documents with respect to the vehicle.

At the conclusion of this evidence, appellant's defense counsel agreed there was "probable cause to stop the car to investigate for a traffic stop. I mean, for a, to see why the tags aren't registered. But I do not believe that the officer had probable cause to arrest Mr. Thompson." Appellant's counsel asserted that failure to provide sufficient identification was not against the law and there was no other driving offense that would have supported appellant's arrest. Counsel further suggested that appellant did provide information concerning his identity. Counsel also addressed the fact that the vehicle

---

**4.** At one point in the transcript, Officer Brown is quoted as saying "[i]t would have been sufficient if he offered it." That comment is part of an overall colloquy where Officer Brown appears to have concluded that the college identification was insufficient. Appellant's expired college identification card does not appear to have been admitted into evidence and is not included in the record on appeal.

was unregistered, but maintained that that was not an arrestable offense either.

The State responded that appellant was unable to confirm his identity, that it was approximately 3:00 a.m., and that appellant presented three different VINs for the vehicle. Under the totality of these circumstances, the State maintained that the arrest of appellant was supported by probable cause.

The suppression court agreed with the State. The court noted that this stop occurred in the early morning hours after Officer Brown ran the tags on the Lexus and determined that the vehicle was not registered. The court then stated:

There's no registration for this car. The car is not registered. Well, who's car is it? There's no way to verify that because there is no registration. So, he stops the driver of the car. He stops the car. And he says to the driver, give me your license and registration. The driver says, I can't produce a license. But here's who I am. I'm, my name is such and such. And I can show you [a] Howard County College ID. And I can show you a birth certificate that's in my pocket. But I don't have any other state ID that shows my identity. Well, you and I are not old enough that we would forget. College ID's are like, I mean, let's stop every eighteen year old that's walking down the street and they probably have three of them. And they have them for all kinds of different reasons that they have them. But see, you can't use that. I mean, that, that doesn't show us who it is. Its [sic] not really a question of who it is as important as who's car is this.

After stating that Officer Brown also asked appellant for information concerning the vehicle, the court stated:

And [appellant] shows him three insurance slips, cards. Some document that's got his name. The name he gave. But its [sic] got three different VIN numbers for this same Lexus ES 300. But its [sic] got three VIN numbers. How can that be? Who's car is this? Is this legitimately Mr. Thompson's car? This isn't normal. This isn't right. What

should he do at that point? Should he say, well, Mr. Thompson I'm going to give you a ticket. You go drive off with the car. Who's car is it? Is it a stolen car? Is it a car, because it's not registered to him. At least D.M.V. says it isn't. Its [sic] not registered. How do we know when the officers say, well, I'm going to write you a ticket, you drive off, are we ever going to find that car again? Who's, is it his car? I mean, legitimately is it his? Or is it yours that was parked in front of your house that was taken from you? How does he know that? How could the officer do anything other realistically than what he did?

The suppression court continued:

That's why he's got to keep the car. Until he can verify that in fact this is a car that belongs to this guy or, or even if it doesn't belong to him that he has the legitimate right to be driving around in. To be, to have. That doesn't have three different VIN numbers on pieces of paper.

The court then stated:

So, what does he do? He arrests the defendant. He impounds the car. He can then take the car back. They can investigate. Who's car is this? Is it his? Is it not his? Is there a reason why there are three separate VIN numbers. Its no other way to do it other than what he did at 2:00 in the morning on whatever the streets were that he arrested him on. And that's why. It seems to me that when you look at the totality of the circumstances here what he did was reasonable. Its [sic] not an unreasonable search and seizure. Its [sic] not. We know the defendant has committed some offenses. We know that by his own admission. But we've got to find out what's the story with this car?

Thereafter, the court heard further argument from appellant's counsel. Counsel suggested that the court's legal conclusion was incomplete because "[s]o far everything that you've said you've not mentioned probable cause for any offense." The suppression court disagreed, responding that the fact that appellant did not have a driver's license and

produced documentation with a variety of conflicting VINs was more than "mere suspicion."

After further argument, defense counsel asked, "maybe I'm, maybe I'm not getting it, but probable cause to arrest him for what?" The court replied: "For being in a stolen car. For, for being in a car that he doesn't have any right to be in." The court agreed with counsel's subsequent assertion that there was no evidence that the car was stolen, then stated, "I agree with you. I agree with everything you're saying. That there could be an explanation for it. There could be. Its [sic] not proof." The court then stated:

> That he committed some crime. Those things. But what I'm saying is, when you put all that together. Here's 2:30 in the morning. A dark street. The, I mean, its [sic] dark because its [sic] 2:30 in the morning. Police officer stops a guy. A car is not registered. Asks him for a license. Don't have a license. Give me papers. Gives him papers with three separate VIN numbers on the papers. That's, that's enough.

After counsel again asked "[t]o arrest him for what?" the court then suggested that recovery of the handgun was reasonable under a different rationale, as follows:

> [THE COURT]: Well, its [sic], see, we don't even have to get to the arrest. Let's get to did they have the right to at that point [to] seize the car?"

> [DEFENSE COUNSEL]: Okay. Let's assume they have the right to seize—

> [THE COURT]: Because that's, that's the issue.

> [DEFENSE COUNSEL]: Okay.

> [THE COURT]: If they have the right to seize the car.

> [DEFENSE COUNSEL]: Okay. But—

> [THE COURT]: Because once they have the right to seize the car then all the things that you want suppressed are in the car.

[DEFENSE COUNSEL]: Okay. But that's not the theory by which he searched the compartment area of the car. He searched him as a search incident to arrest.

[THE COURT]: Because they then inventory the car he said because the car is going to be towed and its going to be taken to some private lot. And they have to do that. That's why the State introduced those procedures.

[DEFENSE COUNSEL]: Right.

[THE COURT]: Because that's what they have to do. That is what they do.

After defense counsel claimed that the police only decided to do the inventory search after they found the pills, during a search incident to arrest, the suppression court again disagreed with counsel's characterization and summarized the issue as follows:

[D]id he have a right at that point to seize the car? I don't know how he could have let the car go. I really don't. I don't know how he if he was doing his job could have said, drive off with the car. I don't know how he could. I don't know how that's reasonable. At that point with what he knows and what he doesn't know how can he let the car go? Its [sic] not registered. Its [sic] being driven by a man who doesn't have a license. We've got three separate VIN numbers. How, how can you let it go?

Therefore, the court ruled that the gun was found after an inventory search. Further, the court stated that "what the officer did was reasonable. If you take all the facts, the totality of the facts given the circumstances here I don't know what else he reasonably could have done." The suppression court then denied the motion to suppress.

Following denial of the motion to suppress, the parties immediately agreed to proceed by way of a not guilty plea on an agreed statement of facts. The State informed the court that the parties would proceed on count one, the illegal possession of a regulated firearm, *see* Md.Code (2003), § 5–133(c) of the Public Safety Article, and the State would nolle prosequi the remaining charges. After determining that ap-

pellant waived his right to a jury trial, the State incorporated Officer Brown's testimony from the suppression hearing. In addition, a report indicating that the aforementioned gun was operable was submitted without objection, as well as an exhibit indicating that appellant was prohibited, under Maryland law, from possessing a regulated firearm based on a prior disqualifying conviction of second degree assault.

After hearing further from appellant's counsel, the court convicted appellant of illegal possession of a regulated firearm. The court then proceeded to disposition and sentenced appellant to five years without the possibility of parole. This appeal followed.

## DISCUSSION

### I.

■ Appellant contends that the suppression court erred in denying his motion to suppress on the grounds that he was illegally arrested for a nonexistent crime and without probable cause. Therefore, according to appellant, the subsequent search incident to arrest and inventory search were tainted by his illegal arrest. The State responds, in light of the facts— that appellant did not have a registration for the vehicle, was unable to provide a driver's license, and produced several documents with conflicting VINs—the suppression court properly determined that there was probable cause to support appellant's arrest. Alternatively, the State suggests that the recovery of the handgun occurred during a lawful inventory search. We agree with the State's latter rationale and will affirm the motion court's ruling because it is clear that the vehicle had to be impounded regardless of whether there was probable cause to arrest appellant in this case.

■ In reviewing the denial of a motion to suppress evidence, the appellate court looks exclusively to the record of the suppression hearing and does not consider the trial record. See Paulino v. State, 399 Md. 341, 347–48, 924 A.2d 308 (2007); Byndloss v. State, 391 Md. 462, 477, 893 A.2d 1119 (2006). In

considering the evidence presented at the suppression hearing, the appellate court extends great deference to the fact finding of the suppression hearing judge with respect to determining the credibilities of contradicting witnesses and to weighing and determining first-level facts. *Brown v. State,* 397 Md. 89, 98, 916 A.2d 245 (2007); *accord Bost v. State,* 406 Md. 341, 349, 958 A.2d 356 (2008). When conflicting evidence is presented, the appellate court accepts the facts as found by the hearing judge unless those findings are shown to be clearly erroneous as a matter of law. *Brown,* 397 Md. at 98, 916 A.2d 245. However, the appellate court does "not engage in *de novo* fact-finding." *Haley v. State,* 398 Md. 106, 131, 919 A.2d 1200 (2007) (citation omitted). Furthermore, where the motion to suppress is denied, the evidence is to be reviewed in the light most favorable to the State as the prevailing party on the motion. *Byndloss,* 391 Md. at 477, 893 A.2d 1119. Nevertheless, as to the ultimate, conclusory fact, the appellate court must make its own "independent constitutional appraisal by reviewing the law and applying it to the facts of the present case." *State v. Williams,* 401 Md. 676, 678, 934 A.2d 38 (2007) (citations omitted).

This case concerns the reasonableness of an arrest and a subsequent search and seizure under the Fourth Amendment. The Court of Appeals has stated:

The Fourth Amendment to the United States Constitution protects persons and places from unreasonable intrusions by the government. The Fourth Amendment does not protect against all seizures, however, but only against unreasonable searches and seizures. *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985). In assessing whether a search or seizure was reasonable, "[t]he touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania v. Mimms,* 434 U.S. 106, 108–09, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977) (quoting *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1878–79, 20 L.Ed.2d 889 (1968)). Reasonableness "depends on a

balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Maryland v. Wilson*, 519 U.S. 408, 411, 117 S.Ct. 882, 885, 137 L.Ed.2d 41 (1997) (quoting *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975)).

*Wilson v. State*, 409 Md. 415, 427–28, 975 A.2d 877 (2009) (footnote omitted).

The motion court's initial ruling was that there was probable cause to support appellant's warrantless arrest and the subsequent search of the vehicle he was driving. As to the meaning of probable cause, the Court of Appeals has provided:

Probable cause, we have frequently stated, is a nontechnical conception of a reasonable ground of a belief of guilt. A finding of probable cause requires less evidence than is necessary to sustain a conviction, but more evidence than would merely arouse suspicion. Our determination of whether probable cause exists requires a nontechnical, common sense evaluation of the totality of the circumstances in a given situation in light of the facts found to be credible by the trial judge.... Therefore, to justify a warrantless arrest the police must point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warranted the intrusion.

*Bailey v. State*, 412 Md. 349, 374–75, 987 A.2d 72 (2010) (citations omitted); *accord Maryland v. Pringle*, 540 U.S. 366, 370–71, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003).

In this case, Officer Brown indicated that he arrested appellant for failure to provide sufficient identification. Officer Brown also testified that the variety of VINs appellant produced were indicative of fraud. The suppression court considered this evidence and suggested that this information supported an inference that appellant was "in a stolen car. For, for [sic] being in a car that he doesn't have any right to be in." Based on this, the State's initial argument is that appellant's arrest was lawful under Section 26–202(a)(2) of the

Transportation Article.[5] The State further asserts that there was probable cause to arrest appellant based on the number of conflicting VINs appellant gave the officer during the course of the traffic stop.

There is authority in Maryland addressing whether appellant's warrantless arrest can be based on his alleged failure to furnish satisfactory evidence of his identity. *Compare Lovell v. State,* 347 Md. 623, 653, 702 A.2d 261 (1997) (holding there was probable cause to arrest appellant for failure to furnish satisfactory evidence of identity under T.A. § 26–202), *with Benbow v. State,* 322 Md. 394, 404, 587 A.2d 1110 (1991) (concluding that State's argument that arrest was legal under T.A. § 26–202 was "strained" considering that "Benbow's identity was never in question"). As for the different VINs, while it is arguable that information tended to move this case from mere suspicion towards probable cause, we conclude it is unnecessary for us to decide that issue because, even if appellant's arrest was illegal, the removal of the unregistered vehicle from the custody of an unlicensed driver was not illegal, and the handgun would have inevitably been discovered during the subsequent lawful inventory search of the vehicle.

 Generally, there are three methods by which evidence obtained after initial unlawful conduct can be purged of any taint: inevitable discovery, independent source, and attenuation. *See Miles v. State,* 365 Md. 488, 520–21, 781 A.2d 787

---

**5.** That section provides, in part:

 (a) *In general.*—A police officer may arrest without a warrant a person for a violation of the Maryland Vehicle Law, including any rule or regulation adopted under it, or for a violation of any traffic law or ordinance of any local authority of this State, if:

 \* \* \*

 (2) The person has committed or is committing the violation within the view or presence of the officer, and either:

 (i) The person does not furnish satisfactory evidence of identity; or
 (ii) The officer has reasonable grounds to believe that the person will disregard a traffic citation; ...

Md. Code (1977, 2009 Repl. Vol.), § 26–202 of the Transportation Article ("T.A.").

(2001); *accord Cox v. State,* 397 Md. 200, 215, 916 A.2d 311 (2007). Under the inevitable discovery doctrine:

[T]he question is not whether the officers did in fact acquire the evidence in question by relying upon an untainted source, but whether the evidence, which was found because of a Fourth Amendment violation, would have been found lawfully. The State must show, by a preponderance of the evidence, that the lawful means which made discovery inevitable were being actively pursued prior to the illegal conduct.

*Hatcher v. State,* 177 Md.App. 359, 397, 935 A.2d 468 (2007) (citations omitted).

Here, after considering whether appellant's arrest was legal, the suppression court determined that the gun was found as a result of the inventory search. Inventory searches have been upheld by the Supreme Court in a variety of contexts. *See Colorado v. Bertine,* 479 U.S. 367, 376, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987) (police may search a canister inside a pouch contained in a backpack inside a locked vehicle either at roadside or at impoundment lot); *Illinois v. Lafayette,* 462 U.S. 640, 648, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) (police may search arrestee's bag and containers therein, rather than sealing the bag for storage pending owner's release); *South Dakota v. Opperman,* 428 U.S. 364, 375–76, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (inventory search of a vehicle may include all containers in the vehicle if the search is conducted according to department policy).

In *Sellman v. State,* 152 Md.App. 1, 828 A.2d 803 (2003), this Court discussed the history of the inventory search exception and concluded that, in order for the exception to apply:

[A]n inventory search must at a bare minimum be a search of lawfully detained property carried out by a police officer in accordance with standard policies established by the officer's law enforcement agency. Without the existence of a standard policy, an officer's actions in conducting the search are not sufficiently regulated to assure that the search is in furtherance of legitimate police caretaking

functions, unrelated to the existence *vel non* of probable cause, and not in furtherance of the officer's own investigatory motives.

*Id.* at 21, 828 A.2d 803; *see also Duncan v. State,* 281 Md. 247, 259, 378 A.2d 1108 (1977) ("[T]he police may, without regard to probable cause, and, thus, absent a warrant, constitutionally enter an automobile and unlocked compartments therein, and inventory and seize articles found, provided the vehicle had been otherwise legally taken into police custody and the inventorying was pursuant to a standard police procedure").

In this case, appellant was driving an unregistered vehicle, and did not produce a Maryland driver's license or a driver's license from any other state. Furthermore, appellant then produced a number of documents containing a variety of conflicting VINs for the vehicle. Officer Brown was unable to verify appellant's identity despite checking a number of sources. Additionally, appellant's passenger left the scene. Under the circumstances, Officer Brown was concerned about leaving the vehicle and therefore determined that he would have it towed from the scene. *See Mackall v. State,* 7 Md.App. 246, 251, 255 A.2d 98 (1969) (the making of inventory of an arrestee's property is "a *bona fide* attempt to safeguard the owner of the inventoried property against loss") (citing *St. Clair v. State,* 1 Md.App. 605, 619, 232 A.2d 565 (1967)).

Officer Brown's decision to have the vehicle towed is consistent with a long line of Maryland cases that give police departments authority to take automobiles in custody, "in furtherance of their community caretaking functions." *Sellman, supra,* 152 Md.App. at 16, 828 A.2d 803. "In *Cady v. Dombrowski,* 413 U.S. 433, 441 [93 S.Ct. 2523, 37 L.Ed.2d 706] (1973), the Supreme Court first used the term 'community caretaker,' and validated the police impounds of automobiles, without underlying probable cause, on the grounds that the police needed to act to protect the public from hazards and interrupted traffic." *Wilson v. State,* 409 Md. 415, 428, 975 A.2d 877 (2009). Officers are allowed to do so for two reasons:

"First, the inherent mobility of automobiles creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible. *Carroll v. United States*, 267 U.S. 132, 153–54 [45 S.Ct. 280, 69 L.Ed. 543] (1925); *Coolidge v. New Hampshire*, 403 U.S. 443, 459–60 [91 S.Ct. 2022, 29 L.Ed.2d 564] (1971)." Second, "less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office."

*Duncan v. State*, 281 Md. 247, 254–55, 378 A.2d 1108 (1977) (citing *Opperman, supra*, 428 U.S. at 367–68, 96 S.Ct. 3092). "Inventory searches of automobiles are frequently made pursuant to these 'community caretaking functions.'" *Duncan v. State*, 281 Md. 247, 256, 378 A.2d 1108 (1977).

Officer Brown testified that he conducted an inventory search of the vehicle in conformance with Baltimore County Police Department policy. That written policy was admitted into evidence, without objection. The specific section of that written policy concerning "vehicle property inventory" provides that the inventory is "[u]sed to identify valuable property taken into police custody. Valuable property is that which has value or is likely to be stolen." In addition, an inventory is to be "[p]erformed every time a vehicle comes into Department custody (e.g., stored/impounded vehicles, vehicles held as evidence, etc)," with the exception of automobile accidents "where the vehicle owner/operator is able to take custody of the property at the scene." [6]

From this, we conclude that it was reasonable for the police to seize the vehicle that appellant was driving based on the totality of the circumstances, including the lack of proper

---

6. That same written policy also provides that, in the case of arrested vehicle operators, the police *"may* secure the vehicle and allow it to remain parked legally, provided: 1) The vehicle is not required for evidence or other purposes; 2) They are aware of their actions and agree to assume full responsibility; 3) They can make arrangements to have the vehicles taken care of by the owner or owner's agent within a reasonable period." (Emphasis added).

registration, the conflicting VINs, appellant's failure to provide license information on demand, and the fact that appellant's passenger was no longer on the scene and available to drive the vehicle. Further, this record establishes that the inventory was performed in accordance with standardized written procedures of the Baltimore County Police Department. The handgun, as well as appellant's identification, located together in a book bag in the trunk of the vehicle, were properly recovered during an inventory search.

Accordingly, we hold that, regardless of whether appellant was lawfully arrested, the handgun would have inevitably been discovered by a later inventory search pursuant to standardized police procedures. The motion was properly denied.

## II.

Appellant next asks us to remand this case for further consideration in light of *Arizona v. Gant*, —— U.S. ——, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009), a case concerning searches incident to arrest that was decided after the suppression court denied appellant's motion. The State responds that we need not decide whether *Gant* applies because the handgun was recovered pursuant to a lawful inventory search. The State further suggests that the specific holding decided in *Gant* was not argued before the suppression court and is unpreserved. Finally, the State contends that *Gant* does not apply and that, even if it did, the good faith exception precludes suppression of the evidence seized under the exclusionary rule.

■ In order to determine the effect of *Gant* on this case, we begin our analysis with a comprehensive discussion of the recognized exceptions to the warrant requirement. For decades, the Supreme Court has embraced the general rule that searches conducted without a warrant are *"per se* unreasonable" and thereby violate the Fourth Amendment to the United States Constitution. *See, e.g., Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (U.S.1967) (citations omitted). "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it

denies law enforcement the support of the usual inferences which reasonable men draw from evidence." *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). Rather, it requires "that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Id.* at 14, 68 S.Ct. 367; *see also United States v. Lefkowitz,* 285 U.S. 452, 464, 52 S.Ct. 420, 76 L.Ed. 877 (U.S.1932) ("Security against unlawful searches is more likely to be attained by resort to search warrants than by reliance upon the caution and sagacity of petty officers while acting under the excitement that attends the capture of persons accused of crime.") (Citations omitted).

In keeping with its recognition of the overwhelming preference for warrants, the Supreme Court has been careful to carve out only a handful of "specifically established and well-delineated exceptions" to the warrant requirement. *Katz,* 389 U.S. at 357, 88 S.Ct. 507 (footnote and citations omitted). For example, the presence of exigent circumstances, such as the hot pursuit of a fleeing felon, will excuse a warrantless search. *Warden, Md. Penitentiary v. Hayden,* 387 U.S. 294, 298, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Similarly, the warrantless stop and frisk of an individual for the limited purposes of briefly investigating reasonably suspicious behavior and ensuring officer safety are permissible. *Terry,* 392 U.S. at 27, 88 S.Ct. 1868. Exceptions to the warrant requirement have also been carved out for: consent searches, *Schneckloth v. Bustamonte,* 412 U.S. 218, 249, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); items in plain view, *Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); searches in heavily regulated industries, *New York v. Burger,* 482 U.S. 691, 707–09, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987); "special needs" searches, *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 653, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995); and searches of automobiles where the officer has probable cause for believing that the vehicle is "carrying contraband or illegal merchandise," *Carroll v. Unit-*

*ed States,* 267 U.S. 132, 149, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

In *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the Supreme Court held that warrantless searches may be conducted incident to a valid arrest. The *Chimel* Court limited such searches, however, to "the arrestee's person and the area within his immediate control." *Id.* at 763, 89 S.Ct. 2034 (internal quotation marks omitted). Twelve years later, in *New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), the Supreme Court extended the *Chimel* rule to allow a search of the entire interior of a car immediately following the arrest of its occupants.

In 2009, the Supreme Court decided *Gant* and rejected a broad interpretation of *Belton,* holding that "*Belton* does not authorize a vehicle search incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle." *Gant, supra,* 129 S.Ct. at 1714. The *Gant* Court added, however, that "circumstances unique to the automobile context justify a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle." *Id.*

In *Gant,* police officers received an anonymous tip that a particular residence in Tucson, Arizona was "being used to sell drugs." *Id.* The officers "knocked on the front door and asked to speak to the owner." *Id.* "Gant answered the door and, after identifying himself, stated that he expected the owner to return later." *Id.* at 1714–15. Subsequently, the officers "conducted a records check, which revealed that Gant's driver's license had been suspended and there was an outstanding warrant for his arrest for driving with a suspended license." *Id.* at 1715. The officers returned to the home that evening, at which time they observed Gant pull up into the driveway. *Id.* After Gant exited the car, one of the officers "immediately arrested Gant and handcuffed him." *Id.* "When two more officers arrived, they locked Gant in the backseat of their vehicle." *Id.* Thereafter, "two officers searched his car: One

of them found a gun, and the other discovered a bag of cocaine in the pocket of a jacket on the backseat." *Id.* Gant was charged with "possession of a narcotic drug for sale and possession of drug paraphernalia." *Id.* Prior to trial, he moved to suppress the evidence seized from his car. *Id.*

Upon review, the Supreme Court held that the exception to the warrant requirement recognized in *Belton* did not justify the warrantless search of Gant's car. *Id.* at 1719. Specifically, the *Gant* Court noted that the exception recognized in *Belton* was derived from "interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Id.* at 1716 (citations omitted). Thus:

> Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest. When these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies.

*Id.* at 1723–24. Because Gant was secured in the backseat of a patrol car when officers initiated the search, there was "no possibility that [he] could reach into the area that law enforcement officers [sought] to search" and, therefore, the warrantless search was not authorized. *Id.* at 1716.

In addition to the arrestee's access to the car, the *Gant* Court noted that the search incident to arrest doctrine might, in a narrow range of circumstances, justify the search of a car to locate evidence. *Id.* at 1719. Such a search would be appropriate "when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.' " *Id.* (quoting *Thornton v. United States,* 541 U.S. 615, 632, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004) (Scalia, J., concurring in judgment)). According to the *Gant* Court, "[i]n many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence." *Id.* (citations omitted). In contrast,

where there is a drug or gun charge, "the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein." *Id.* (citations omitted).

We note that *Gant* did not consider whether evidence illegally obtained under a purported search incident to arrest may be admissible if it was inevitably discovered during a valid inventory search. Indeed, the Arizona Supreme Court found that the inventory search exception did not apply in that case because the officers "had no intention of impounding Gant's car until after they searched the passenger compartment and found the contraband." *State v. Gant,* 216 Ariz. 1, 162 P.3d 640, 646 (2007) (citation omitted), *aff'd, Gant,* 129 S.Ct. at 1720.

Our research reveals that, subsequent to the Supreme Court's decision in *Gant,* other courts have held that, even if a vehicle search was not a proper search incident to arrest, that search nevertheless may still be lawful as an inventory search. *See, e.g., United States v. Ruckes,* 586 F.3d 713, 719 (9th Cir.2009) (holding that "the deterrent rationale for the exclusionary rule is not applicable where the evidence would have ultimately been discovered during a police inventory of the contents of Rucke's car").

As indicated in our discussion of appellant's first question presented, we conclude that seizure of the handgun in the trunk of the vehicle appellant was driving was lawful because it was discovered in a valid inventory search. Accordingly, that conclusion makes it unnecessary to address whether the seizure was also lawful as a search incident to arrest under *Gant.* It is also unnecessary to consider the State's remaining argument that the good faith exception precluded suppression of the evidence seized under the exclusionary rule, which we would ordinarily decline to do. *See* Md. Rule 8–131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court . . . ."); *accord Robinson v. State,* 404 Md. 208, 216, 946 A.2d 456 (2008).

JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.